United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT S. HUDSON,

Plaintiff,

v.

A.P. KANE, ACTING WARDEN, THE CORRECTIONAL TRAINING FACILITY,

Defendant.

________________________________________/

No. C 04-02232 SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Robert S. Hudson, a California prisoner incarcerated at Correctional Training Facility, Soledad, filed this action on June 07, 2004, seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After reviewing the papers and evidence submitted, the Court DENIES the petition for the reasons discussed below.

## BACKGROUND

Robert S. Hudson was convicted of first degree murder pursuant to a guilty plea in Los Angeles County Superior Court. On July 10, 1984, he was sentenced to twenty-five years to life in prison. In this action, petitioner challenges the execution of his sentence. Petitioner asserts that his federal due process rights were violated when the Board of Prison Terms ("BPT") found him unsuitable for parole in May 2003.

### 1. The commitment offense.

Reports from parole suitability determinations (June 24, 1998, November 5, 2001, and May 21, 2003) and a probation officer's report dated July 10, 1984, describe the crime as follows:

Hudson and the victim, Duane Keith Rice, had been dealing drugs for approximately six years. Business dealings between Hudson and Rice had gone bad, and Hudson developed animosity towards Rice.

United States District Court
For the Northern District of California

Both Hudson's wife and his friend, Patrick Dickey, convinced Hudson to rob Rice for money. Rice was known to typically carry large sums of money on his person for his narcotics business, and Hudson believed that he would be able to obtain approximately $50,000 from Rice. For over a month, Hudson and Dickey devised a plan to assault and rob Rice. Hudson maintains that the original plan was not to murder Rice, but to assault and rob him. Although Hudson admits to previous alcohol abuse problems, he maintains that he was not drinking on the day of the murder.

On February 28, 1983, Hudson and Dickey carried out the plan. In the course of the robbery, Rice attempted to defend himself. A struggle ensued and Hudson and Dickey repeatedly struck Rice with a metal pipe, splitting Rice's head open and killing him. Dickey suggested that he and Hudson clean-up the mess and dump the body in Lake Mead, Nevada. Hudson and Dickey wrapped Rice's body in plastic and loaded the body into Rice's van. After thoroughly cleaning the crime scene, Hudson and Dickey began driving to Las Vegas. On the way, they stopped at an all-night sporting goods store and bought a rubber raft and lead weights. Hudson and Dickey weighted Rice's body down with the lead weights, rowed out into the middle of Lake Mead, and tossed the body into the water. Hudson and Dickey then drove Rice's van to Tijuana, Mexico and cleaned and abandoned the van. Rice's body has never been recovered.

On January 24, 1984, Diane Carol Hudson, petitioner's spouse, contacted Detective Douglas McCormack of the Pomona Police Department and voluntarily stated that she believed Hudson and Dickey were involved in the murder of Rice. McCormack also interviewed William Howard Robertson on February 23, 1984. Robertson stated that in late 1983, Hudson had mentioned that a pipe had been used to kill Rice, and detailed other aspects of the crime, including dumping the body in Lake Mead and abandoning the victim's car in Mexico.

Hudson entered a guilty plea for first degree murder on July 10, 1984, and was sentenced to twenty-five years to life. Hudson's minium eligible parole date was July 17, 1999.

**2. Parole proceedings.**

Hudson has had four parole suitability hearings (June 24, 1998, November 5, 2001, May 21, 2003,

and August 18, 2004). This petition is against the third parole suitability hearing (May 21, 2003), at which Hudson was denied parole for one year. Hudson was subsequently denied parole for an additional year at the August 2004 hearing.

Hudson and his attorney were both present and given an opportunity to speak. The BPT panel enumerated the facts of the crime, to which Hudson stipulated. The panel considered Hudson's past criminal history, which consisted of minor drug-related charges, one conviction for misdemeanor marijuana possession, and no violent crimes. The panel also reviewed Hudson's prison record and found no serious disciplinary actions (only one 128(a) violation for misappropriation of state food in 1986–a misdemeanor) and an exceptional number of laudatory reports relating Hudson's participation in self-help programs, volunteer programs, and educational and vocational training. Hudson also presented a letter containing a job offer upon his parole, and statements of family support for his release. The psychological report determined Hudson's potential for violence once released was no higher than the average citizen and was supportive of release.

The panel concluded that Hudson was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time." Resp't Ex. B at 34. The primary reasoning was the timing and gravity of the offense. The BPT stated that the offense was

> carried out in . . . a vicious, brutal manner. The gentleman was bashed in the head with a pipe . . . The victim was mutilated during the offense. The offense was carried out in a dispassionate and calculated manner and that it was planned out. It was a process to try and deceive or avoid prosecution by taking his body and dumping it and weighting it down in Lake Mead. Then on top of that as well, his vehicle was disposed of in another country, in Mexico, after the fact of the murder. . . . The offense was carried out in a manner which demonstrates a cold-hearted disregard for human sufferings.

Id. at 34-35. The panel also expressed concerns of Hudson's criminal history and his prior problems with substance abuse.

> The prisoner has an escalating pattern of criminal conduct and violence and a history of unstable tumultuous relationships with others. . . [He had] failed to profit from society's previous attempts to correct his criminality. Such attempts included probation.

Id. at 35. The panel commended Hudson on his behavior in prison and his educational and self-help achievements. However, the panel found that the "positive aspects of [Hudson's] behavior don't outweigh the factors of unsuitability at this time" and recommended that Hudson remain disciplinary-free and "continue self-help programming to better understand the causative factors." Id. at 38. The panel expressed that if Hudson

United States District Court
For the Northern District of California

continues disciplinary-free and maintains what he is doing in prison, that "it is felt that [he] will get a date at some point here fairly soon." Id.

Hudson's fourth denial of parole was based "a lot on the crime." The BPT again characterized the crime as especially cruel and callous. However, in contrast to the third hearing, the BPT found that the prisoner did not have much of an escalating pattern of criminal conduct and no violent offenses. The psychological evaluation showed that his level of dangerousness was that of an average citizen in the community. The BPT denied parole and recommended the prisoner continue to remain disciplinary-free and participate in self-help programs.

**3. State habeas proceedings.**

After the BIT's third denial of parole, Hudson sought a writ of habeas corpus in state court. The Los Angeles County Superior Court denied the petition for writ of habeas corpus because petitioner "failed to show a prima facie case for relief." Resp. Ex. H. The California Court of Appeals and the California Supreme Court denied Hudson's petition without comment. Resp. Ex. G, H.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus if the

> adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is contrary to established law if it applies a rule that contradicts the law as set forth by the Supreme Court, or arrives at a different result in a case that is "materially indistinguishable" from a Supreme Court decision. Penry v. Johnson, 532 U.S. 782, 792 (2001). Unreasonable application of established law occurs when the court "correctly identifies the governing legal rule but applies it unreasonably to the facts." Id. Under AEDPA, although Supreme Court precedent is the only controlling authority, Ninth Circuit case law is persuasive authority for the purposes of review of previous state court decisions. Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002), *amended by* 311 F.3d 928 (9th Cir. 2002).

In reviewing a habeas corpus petition, a federal court must look at the last reasoned decision of the state court to determine whether that court's decision was contrary to or an unreasonable application of established federal law. Id. at 960-61. When confronted with denials without citation or that offer no rationale, the court's scope of review must include an "independent review of the record . . . to determine whether the state court clearly erred in its application of controlling federal law." Id.

## DISCUSSION

### 1. State claims have been exhausted.

Respondent argues that the petition should be dismissed because it contains a claim that has not been exhausted in state court. Respondent contends that petitioner never presented the claim that his federal due process rights were violated because the BPT does not normally grant parole.

Under AEDPA, a federal district court can grant a writ of habeas corpus with respect to the judgment of a state court only after the petitioner has exhausted all remedies available in the courts of the state. 28 U.S.C. § 2254(b)(1)(A). Hudson's petition to the California Supreme Court specifically claims that the "Board's bias against granting parole . . . violat[ed] Petitioner's state and federal due process rights, depriving him of his federally protected liberty interest." Resp't Ex. I.

This Court finds that Hudson fairly presented his federal claims to the state courts and gave the state court a fair opportunity to adjudicate his claims of federal due process violations. His habeas petition should not be dismissed based on unexhausted state claims.

### 2. Petition is not moot.

Respondent argues that Hudson's petition for review of the denial for parole after his May 2003 parole suitability hearing is moot because he has since received subsequent parole considerations that again found him unsuitable for parole. Hudson argues that under Ninth Circuit case law, his petition is not moot. Furthermore, suitability hearings after the May 2003 hearing do not make petitioner's challenge to May 2003 hearing moot since he is still incarcerated as a result of the subsequent hearing.

The Ninth Circuit has determined that where claims are "capable of petition yet evading review,"

exceptions to mootness[1] apply. Hubbart v. Knapp 379 F.3d 773, 777 (9th Cir. 2004), cert. denied, 125 S. Ct. 913 (2005) (habeas petition challenging a two-year commitment under California's Sexually Violent Predators Act was found to "evade review" because its duration was too short to be fully litigated prior to its expiration). These exceptions apply when (1) litigation likely takes longer than the duration of the challenged action, and (2) it is likely that the same complaining party will be repeatedly subject to the same action. Id.

Under Ninth Circuit reasoning in Hubbart, parole suitability hearings that are conducted each year fall under both exceptions to mootness. Therefore, Hudson's petition for review of his May 2003 hearing is not moot simply because he has since received another parole suitability hearing.

**3. The plea agreement was not violated.**

**A. Plea agreements are construed using contract interpretation.**

Petitioner argues that he has fully served the sentence contemplated by the plea contract since, at the time of the plea, the government offered him the opportunity to secure parole after serving his minimum term if he stayed disciplinary-free and programmed appropriately. Petitioner also argues that the plea agreement precludes the BPT from relying on the facts of the crime in parole suitability determinations. Respondent argues that the plea agreement was not violated by denying petitioner parole because the negotiated plea only agreed to drop contemplation of a possible death sentence for guaranteed sentence of twenty-five years to life.

Plea agreements are contractual in nature and are construed using ordinary contract interpretation. Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003). Under the due process rights of the federal constitution, the defendant has the right to enforce the terms of a plea agreement. Id. at 1159. The language of the plea agreement and the conduct of the parties during the plea colloquy must be examined in order to determine the intent of the parties. Id. at 1160. "[D]ue respect for the integrity of plea bargains demands that once a defendant has carried out his part of the bargain the Government must fulfill its part." Santobello v. New York, 404 U.S. 257, 262 (1971).

Petitioner's claim that the plea agreement was violated lacks evidentiary support. The record before this Court does not disclose any statements or terms of the plea bargain. Petitioner also argues that the plea

---

[1]The mootness doctrine is based on the requirements of Article III, § 2, of the U.S. Constitution.

United States District Court
For the Northern District of California

bargain operated as a stipulation by the trial court that the crime was to be treated as a parole-eligible murder and that the plea agreement also precluded the BPT from using the facts of the crime in parole suitability determinations. In In re DeLuna, 126 Cal. App. 4th 585, 599 (2005), the court held that although a plea agreement estops parties from arguing that the defendant should be incarcerated longer than the "existing matrix,"[2] when nothing in a plea agreement specifies otherwise, the prosecutor (and by extension other agents acting on behalf of the government) can continue to oppose parole based on the characterization of the crime as especially callous. As far as this Court can determine from the record, the petitioner received the sentence expected from the plea agreement: 25-years to life with parole eligibility, rather than a capital murder sentence. Nothing in the record shows that the plea agreement included a provision precluding the BPT from using the commitment offense as an impediment to parole. Furthermore, at each parole hearing, the petitioner stipulated to the facts of the crime, as laid out by the BPT, that it would use in determining parole suitability. The BPT is directed to consider all relevant and reliable information available in determining parole suitability. Id., 15 Cal. Code Regs. § 2402. An attempt to curtail the BPT's exercise of discretion exceeds the court's authority. In re DeLuna, 126 Cal. App. 4th at 599.

This Court cannot find that the plea agreement included any terms or promises that would guarantee petitioner's release after serving the minimum term on condition he remain disciplinary-free and participate in self-help and educational programs, or that the BPT could not consider the facts of the crime in parole suitability determinations. Thus, this Court finds that the respondent has not violated the plea agreement by denying parole once the petitioner served the minimum term of the sentence or in using the facts of the crime in parole suitability determinations.

**B. BPT's use of the facts of the crime is authorized.**

Petitioner also argues that the plea agreement precludes the BPT from relying on the facts of the crime even as a partial basis for denying parole. Petitioner analogizes the BPT's use of the facts of the crime to

[2] The regulations contain a matrix of suggested base terms for several categories of crimes that give a range of years depending on the facts of the crime. For example, a first-degree murder may carry a minimum sentence as low as twenty-five years to as high as thirty-three years. Among factors considered are the relationship of the victim to the prisoner, how the killing was accomplished (i.e., beating, strangulation, stabbing, etc.), whether the victim died immediately, and if torture was involved. See 15 Cal. Code Regs. § 2403.

United States District Court
For the Northern District of California

limitations imposed by the Supreme Court in trial court sentencing determinations. See generally Apprendi v. New Jersey, 530 U.S. 466 (2000); Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). In both Apprendi and Blakely, the Supreme Court held that the trial court could not use facts outside those found by the jury or those stipulated to in the plea agreement to increase the defendant's sentence beyond the statutory framework for the offense. However, the BPT is not only authorized, but required, to look at the facts of the crime in determination of parole suitability. 15 Cal. Code Regs. § 2402. Furthermore, at each BPT hearing, petitioner stipulated to the facts of the crime as laid out by the BPT. The BPT did not increase the statutory term by denying petitioner parole at his first hearing, or at subsequent hearings, with a finding that the concern for public safety requires further incarceration. This is part of the BPT's discretion. Cal. Penal Code § 3041(b). Under California law, the BPT can decide that the facts of the offense make it unsafe to fix a parole date as long as the BPT points to factors beyond the minimum elements of the crime. See In re Dannenberg, 34 Cal. 4th at 1071. Petitioner also argues that the BPT, in setting a release date, is required to assure uniformity in the term-setting practices (i.e., similar offenses have uniform sentencing). However, petitioner ignores the fact that the statutory scheme weights individual suitability for parole more heavily than term uniformity. In re Dannenberg, 34 Cal. 4th at 1070-71:

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentencees should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "unless [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "public safety" concerns requiring further indefinite incarceration . . . Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a continuing public danger.

Id. at 1070 (emphasis, brackets, and parentheses as in original). The BPT only need set a base term for a life prisoner who is found suitable for parole. 15 Cal. Code Regs. § 2403(a).

Therefore, this Court does not find that the BPT is precluded from using the facts of the crime in determining petitioner's parole suitability.

**4. Due process violation.**

Petitioner argues that, under Supreme Court and Ninth Circuit case law, California's parole statutes create a liberty interest in parole by using the words "shall normally." Petitioner further contends that his due

United States District Court
For the Northern District of California

process rights were violated because of BPT's repeated reliance on the unchanging facts of the crime to deny parole, and that BPT's repeated denial of parole is not supported by "some evidence."

**A. California statutes create a liberty interest in parole.**

The Ninth Circuit has clearly held that California's parole scheme, which uses mandatory language ("shall normally"), gives rise to a federally protected liberty interest in parole. McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002). The existence of a federally protected liberty interest in parole, in turn, allows federal courts to consider the due process questions in habeas petitions challenging denials of parole. "A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." Id., at 900.

Respondent asserts that McQuillion was "erroneous," and apparently suggests that this Court simply ignore it. Answer, at 8. This Court, of course, is not free to ignore Ninth Circuit precedent, and in any event respondent's analysis of McQuillion is entirely unconvincing. The Supreme Court has clearly stated that while there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," a state's statutory parole scheme that uses mandatory language may create a presumption that parole release will be granted, thereby creating a constitutionally protected liberty interest. Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7, 11-12 (1979) (Nebraska parole statute, providing that the board "shall" release prisoner subject to certain restrictions, creates due process liberty interest in release on parole); Board of Pardons v. Allen, 482 U.S. 369, 376-78 (1987) (Montana parole statute, providing that the board "shall" release prisoner subject to certain restrictions, creates due process liberty interest in release on parole). In Sandin v. Conner, 515 U.S. 472, 481 (1995), the Supreme Court rejected the Greenholtz "mandatory language" analysis with respect to prison regulations and administrative management of prisons, but did not address parole eligibility determinations. Sandin, 515 U.S. at 481-82. McQuillion does not erroneously apply a pre-Sandin test, as respondent suggests.

**B. California parole standards.**

California uses indeterminate sentences for most non-capital murders. A first-degree murder conviction

United States District Court
For the Northern District of California

yields a minimum sentence of twenty-five years to life. Cal. Penal Code § 190. One year prior to the inmate's minimum eligible release date, the BPT meets with the inmate to determine a parole release date. Cal. Penal Code § 3041(a). The statute provides: "The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore cannot be fixed at this meeting." § 3041(b). Parole suitability determinations proceed by first determining if the prisoner is suitable for release on parole. 15 Cal. Code Regs. § 2402(a). Regardless of the length of time served, a prisoner "shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." § 2402(a). Section 2402 also outlines factors that the BPT considers in parole hearings to support or oppose parole suitability.[3]

The California Supreme Court has determined that the BPT can use the facts of the crime alone to support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. In re Dannenberg, 34 Cal. 4th at 1071. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Id. However, "sole reliance on the commitment offense might . . . violate section 3041, subdivision (a)'s provision that a parole date 'shall normally be set'. . . and might thus also contravene the inmate's constitutionally protected expectation of parole." Id. Such a case would occur "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." Id. at 1094-95 (quoting In re Rosenkrantz, 29 Cal. 4th 616, 683 (2002), cert. denied, 538 U.S. 980 (2003)).

The BPT's decision to deny parole must be based on "some evidence" in order to satisfy the

[3] 15 Cal. Code Regs. § 2402(c) lists factors that show unsuitability and include: (1) the nature of the commitment offense, i.e., whether the offense was committed in a especially heinous, atrocious or cruel manner, (2) previous record of violence, (3) unstable social history, and (4) negative institutional behavior. § 2402(d) lists factors that show parole suitability and include: (1) no juvenile record, (2) stable social history, (3) signs of remorse, (4) motivation for crime, i.e., crime was committed as a result of significant stress, (5) lack of criminal history, (6) whether present age reduces chances of recidivism, (7) understanding and plans for the future, and (8) positive institutional behavior.

requirements of due process. McQuillion, 306 F.3d at 904 (adopting "some evidence" standard for disciplinary hearings set forth in Superintendent v. Hill, 472 U.S. 445 (1985)). Additionally, the evidence underlying the board's decision must have some indicia of reliability. Id.

**C. The BPT's denial of parole suitability was supported by some evidence.**

Petitioner argues that the BPT's denial of parole based on the commitment offense and finding of increased pattern of criminality is not based on any evidence and violates petitioner's due process rights. Petitioner further argues that continued reliance on the unchanging facts of the crime in denying parole is in violation of due process.

**i. Nature of the offense.**

One of the factors that the BPT can consider in denying parole is that the offense was committed in an "especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1).[4] The BPT determined that Hudson was not suitable for parole primarily on the gravity of the offense. This Court must consider whether there is some evidence to support the decision to deny Hudson parole.

Some evidence supports the BPT's determination that the killing was done in a cruel and callous manner. Beating a person to death with a pipe demonstrates an offense carried out in a dispassionate manner and with callous disregard for human suffering. The murder of the victim was due to several beatings by both Hudson and his partner. Although there was the opportunity to stop the beating after Hudson hit the victim with the pipe once, he neither stopped himself, stopped his partner from beating the victim, nor called for help. Both men continued to beat the victim until his head was smashed open and he died. The murder was also committed during commission of a robbery. After the killing, Hudson and his partner went on to great lengths to hide the body and avoid detection by police. The house was cleaned, the body was driven to Nevada in

[4] Factors to be considered include: (A) mulitple victims were attacked, injured or killed in the same or separate incidents, (B) the offense was carried out in a dispassionate and calculated manner, such as an execuation-style murder, (C) the victim was abused, defiled or mutilated during or after the offense, (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, (E) the motive for the crime is inexplicable or very trivial in relation to the offense. 15 Cal. Code Regs. § 2402(c)(1).

United States District Court
For the Northern District of California

the victim's car, weighted down with weights purchased at an all-night sporting goods store, rowed out in a rubber raft, and dumped into Lake Mead. Hudson then drove and abandoned the victim's car in Mexico. Hudson hid the crime from authorities for at least three years while the victim's family anguished over his disappearance. Had Hudson not told his spouse of the crime, and had she not seen fit to notify the police, it is likely that the disappearance of the victim would have continued to remain unsolved.

Hudson's activities on the day of the offense were beyond the minimum elements necessary to constitute first degree murder. This Court finds that the BPT's decision to deny parole by relying on the facts of the crime are based on "some evidence."

**ii. Increased pattern of criminality.**

This Court does not find the BPT determination that Hudson had a prior "escalating pattern of criminal conduct and violence" is based on some evidence. Prior to the commitment offense, Hudson had only been charged with minor drug-related offenses and had no convictions for violent crimes. In order to find unsuitability based on a previous record of violence, the BPT must find that the prisoner had previously "inflicted or attempted to inflict serious injury on a victim . . . [or] demonstrated serious assaultive behavior at an early age." 15 Cal. Code Regs. § 2402(c)(2). Hudson's prior record does not support a finding of a previous record of violence. However, since this is only a minor reason that the BPT denied parole, and according to the discussion above, this determination by the Court does not impact the final decision to deny the writ.

**iii. Petitioner's denial of parole at the May 2003 hearing did not violate his due process rights.**

Petitioner argues that the BPT has relied solely on the unchanging facts of the crime to deny him parole, which violates due process.

Petitioner relies on the Ninth Circuit decision in Biggs v. Terhune that suggests that continued reliance solely on the unchanging facts of the crime and conduct prior to imprisonment to deny parole, even if supported by "some evidence," could result in a due process violation. Biggs v. Terhune, 334. F.3d 910, 916-17 (9th Cir. 2003). In Biggs, petitioner's habeas petition challenged the failure of California BPT to find him suitable

for parole at his first suitability hearing because the denial was based solely on the unchanging facts of the gravity of the commitment offense and his prior criminal record. Id. at 913. The Ninth Circuit denied the writ, stating that the BPT's "reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law." Id. at 916. The court noted, however, that continued denial based solely on these two factors "would raise serious questions involving [petitioner's] liberty interest in parole." Id.

In Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005), a district court relied on this language in Biggs to hold that the BPT's reliance on the crime to deny a prisoner parole violated due process. In Irons, petitioner challenged his fifth denial of parole because the BPT based the denial on the unchanging facts of the crime. Id. at 939. The BPT had relied solely on the crime for at least three previous hearings. Id. at 947. Psychological reports from three years prior to his fifth hearing were supportive of release. Id. at 945. The court held that "[u]nder these circumstances, the continued reliance on [the facts of the crime] . . . violated due process. Id. at 947.

In the present case, petitioner's first parole suitability determination was denied based on three factors: (1) the facts of the crime, (2) an unstable social history with past criminal history and substance abuse, and (3) a psychological report that was not fully supportive of release. Although the second parole suitability determination relied to a large extent on the facts of the crime to deny parole, the BPT was also concerned that the psychological report was not totally supportive of release and indicated that petitioner's potential for violence was higher than that of the average citizen. "We want it to be no threat to the community, period." Pet'r Ex. F at 48. It is not until petitioner's third and fourth parole suitability determinations where the psychological report was supportive of release that the BPT's only reason to deny parole were the facts of the crime. The question is whether there is any evidence in the record that could support the conclusion reached by the decision-maker. See Superintendent v. Hill, 472 U.S. at 454. Substantial deference is given to the BPT in determination of whether a prisoner is suitable for parole. The BPT followed the appropriate guidelines in 15 California Code of Regulations § 2402 and there was some evidence to support the denial of parole based on the facts of the crime.

Now before the Court is petitioner's third denial of parole, which was the first denial based solely on

the facts of the crime. Petitioner's present situation falls under the same factual circumstances as Biggs, which held that a prisoner's due process rights are not violated the first time parole is denied based solely on the facts of the crime. Petitioner has subsequently had a fourth hearing in August 2004, in which the BPT again denied parole based on the facts of the crime. Resp't Ex. J. He is due for his fifth parole hearing in August 2005. A denial based on the unchanging facts of the crime at the August 2005 hearing would make it the third time that petitioner is denied parole solely on the basis of the facts of his convicted offense. At that time, petitioner's situation would be more factually similar to the Irons case and would more clearly require analysis of the concerns raised in Biggs, that continued denial based solely on the facts of the crime can raise serious questions of due process violations.

At this time, based on the discussion above, the Court does not find that BPT's reliance solely on the nature of the offense in denying petitioner parole at his May 2003 hearing violates petitioner's federal due process rights.

///

**CONCLUSION**

The petition for writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: August 22, 2005

SUSAN ILLSTON
United States District Judge